# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

Conservation Law Foundation, Inc.

       Plaintiff,

v.

Cooke Aquaculture USA, Inc.

       Defendant.

Case No. 1:25-cv-00013-KFW

**Oral Argument Requested**

**Leave to File Excess Pages
Granted on September 8, 2025**

## COOKE AQUACULTURE USA INC.'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO RULES 12(B)(1) AND 12(B)(6)

### TABLE OF CONTENTS

Introduction .................................................................................................................... 1

Statement of Facts ......................................................................................................... 2

Argument ..................................................................................................................... 12

Standard of Review ...................................................................................................... 12

   I.   The Amended Complaint Does Not Allege Sufficient Facts to Meet Article III Standing
Requirements. ........................................................................................................... 12

      A.   Legal Requirements for Article III Individual Standing ................................. 13

      B.   CLF's Amended Complaint Fails to Meet Article III Standing Requirements ........... 15

   II.   Count I Fails Because CLF Alleges Violations of Unenforceable Standards ................. 18

      A.   Count I Fails To The Extent It Conditions Compliance On The Quality Of The
Receiving Waters. ..................................................................................................... 20

      B.   Count I Fails To The Extent It Relies On Permit Provisions That Do Not Explain What
Cooke Must Do. ....................................................................................................... 21

   III.   The Permit Shield Bars CLF's Claims In Counts I, II, III, IV, and V Because Cooke Is In
Compliance with its Permits. ...................................................................................... 22

      A.   Cooke's Discharges are Authorized Under its Permits ................................. 23

      B.   CLF's Sampling Protocols and Results Are In Accordance with the Permit ............... 29

   IV.   Counts III and VI Fail Because CLF fails to plausibly allege required ongoing violations
of the CWA. ............................................................................................................. 31

Conclusion ................................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*A.G. ex rel. Maddox* v. *Elsevier, Inc.*,
   732 F.3d 77 (1st Cir. 2013) ............................................................................................ 12, 23

*Acosta–Ramirez* v. *Banco Popular de P.R.*,
   712 F.3d 14 (1st Cir. 2013) .................................................................................................... 12

*Ashcroft* v. *Iqbal*,
   556 U.S. 662 (2009) ................................................................................................ 12, 14, 15

*Bearden v. Ballad Health*,
   967 F.3d 513 (6th Cir. 2020)................................................................................................. 15

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007) ........................................................................................................ 12, 32

*City & Cnty. of San Francisco, California v. Env't Prot. Agency*,
   604 U.S. 334 (2025) ................................................................................................... *passim*

*Congaree Riverkeeper, Inc. v. Carolina Water Serv., Inc.*,
   248 F. Supp. 3d 733 (D.S.C. 2017)....................................................................................... 30

*Conservation L. Found., Inc. v. New Hampshire Fish & Game Dep't*,
   2020 WL 5102830 (D.N.H. Aug. 27, 2020) .................................................................... 31, 32

*CLF v. Continental Paving Inc.*,
   2016 WL 7116019, (D.N.H. Dec. 6, 2016) ............................................................................ 14

*Ctr. for Biological Diversity v. United States Dep't of the Interior*,
   144 F.4th 296 (D.C. Cir. 2025) .............................................................................................. 13

*Douglas v Hirshon*,
63 F.4th 49, 55 (1st Cir. 2023) ................................................................................................ 25

*Draper* v. *Healey*,
   827 F.3d 1 (1st Cir. 2016) ...................................................................................................... 13

*E. I. du Pont de Nemours & Co. v. Train*,
   430 U.S. 112 (1977).................................................................................................................. 23

*Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*,
   95 F.3d 358 (5th Cir. 1996).................................................................................................... 14

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
    484 U.S. 49 (1987) ...................................................................................... 31, 32

*Haley* v. *City of Boston*,
    657 F.3d 39 (1st Cir. 2011*)* ................................................................................ 3

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012) ......................................................................... 12, 14

*Lujan* v. *Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................... 13, 14

*Nat. Resources Council of Maine v. Int'l Paper Co.*,
    424 F. Supp. 2d 235 (D. Maine 2006) .................................................................. 3

*New Comm Wireless v. Sprintcom, Inc.*,
    213 F. Supp. 2d 61 (D.P.R. 2002) ....................................................................... 1

*Pawtuxet Cove Marina, Inc. v. Ciba-Geigy* Corp.,
    807 F.2d 1089 (1st Cir. 1986) ........................................................................... 32

*Pilgrim Public Interest Lobby v. Dow Chemical Co*.,
    1996 WL 903838 (E.D. Mich. Feb. 16, 1996) ................................................... 32

*Nat'l Res. Def. Council v. Cty. of Los Angeles*,
    725 F.3d 1194 (9th Cir. 2013) ........................................................................... 30

*Sierra Club v. ICG Hazard, LLC*,
    781 F.3d 281 (6th Cir. 2015) ............................................................................. 23

*Spokeo, Inc.* v. *Robins*,
    136 S. Ct. 1540 (2016) ....................................................................................... 13

*Tennessee Riverkeeper v. Waste Connections of Tennessee, Inc.*,
    769 F. Supp. 3d 784 (M.D. Tenn. 2025) ................................................. 14, 15, 32

*U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC*,
    339 F.3d 23 (1st Cir. 2003) ............................................................................... 31

*United States v. AVX Corp.*,
    962 F.2d 108 (1st Cir. 1992) ............................................................... 12, 14, 15, 16

*White v. United States*,
    601 F.3d 545 (6th Cir. 2010) ............................................................................. 15

*Wisconsin Resources Protection Council v. Flambeau Min. Co.*,
    727 F.3d 700 (7th Cir. 2013)..................................................................................23

## Statutes

33 U.S.C. § 1251(a) ...................................................................................................... 2
33 U.S.C. § 1314(b) ...................................................................................................... 6
33 U.S.C. § 1322 .......................................................................................................... 29
33 U.S.C. § 1342 ..................................................................................................... 2, 19
38 M.R.S.A. § 465-B .............................................................................................. 20, 21
Cal. Water Code § 13050 ............................................................................................ 19

## Regulations

40 C.F.R. § 136 ............................................................................................................. 8
40 C.F.R. § 451 ................................................................................................... 6, 26, 27
69 Fed. Reg. 51892 ............................................................................................... 6, 27
90 Fed. Reg. 15653 ..................................................................................................... 20

## INTRODUCTION

This is a Clean Water Act citizen suit brought by the Conservation Law Foundation, Inc. ("CLF") against Cooke Aquaculture USA, Inc. ("Cooke") alleging violations of its permits to operate Atlantic salmon aquaculture facilities in Maine.

Cooke owns and operates thirteen Atlantic salmon net pen aquaculture facilities off the coast of Maine. Am. Compl. ¶¶ 45–46, 59–60.[1] All thirteen facilities are separately regulated by the Maine Department of Environmental Protection (the "MEDEP") under the Clean Water Act ("CWA"), and each has received a facility-specific permit to conduct activities. Permits have been in place since 2014 for twelve facilities and since 2016 for the thirteenth facility.

The Amended Complaint alleges various violations of Cooke's permits based upon assertions of improper discharges, improper sampling protocol and unauthorized results, and failure to comply with reporting requirements. However, the Amended Complaint cannot stand because it is legally deficient in multiple ways. The Amended Complaint should be dismissed because it fails to allege a cognizable case or controversy under Article III of the U.S. Constitution, fails to meet threshold pleading standards under Rule 8 of the Federal Rules of Civil Procedure, relies in part on permit provisions that have been invalidated by the U.S. Supreme Court, asserts violations of the permits where Cooke is actually in full compliance with them, and alleges violations that are not ongoing as required to establish liability.

*First*, the Amended Complaint fails to allege a case and controversy under Article III because it does not identify any CLF members who have suffered or who are at imminent risk of suffering harm with respect to each of Cooke's individually permitted net pen facilities. Failing in this regard, the Amended Complaint also necessarily fails because it attempts to identify acts or

---

[1] Defendants adopt the alleged facts from the Amended Complaint for the purposes of this motion only. *See New Comm Wireless v. Sprintcom, Inc.*, 213 F. Supp. 2d 61, 64 n.2 (D.P.R. 2002).

1

omissions that are fairly traceable to individualized, personal harm based solely on insufficient and conclusory factual allegations.

*Second*, Count I is based on Cooke's alleged violation of "narrative standards." Am. Compl. ¶¶ 328-338. The Supreme Court in *City & Cnty. of San Francisco v. Envt'l Prot. Agency* recently held that such narrative standards based on the overall quality of receiving waters as well as language prohibiting discharges that generically cause "pollution, contamination, or nuisance" are invalid and unenforceable. Since Count I relies exclusively on invalid narrative standards, as a matter of law it cannot be sustained.

*Third*, a complete review of all allegations shows the Amended Complaint does not allege CWA violations in Counts I–V because Cooke is in compliance with its permits and therefore is not liable under the permit shield doctrine. The Amended Complaint fails to fully consider the permits' pertinent requirements, misinterprets the permits' terms and conditions, and relies on permit requirements that do not exist. In addition, in general, the Amended Complaint fails to meet Rule 8 pleading standards by not alleging plausible nonconclusory facts.

*Fourth*, in Counts III and VI, CLF has failed to plausibly allege that Cooke's 13 net pen facilities are engaging in ongoing violations of their respective permits, which is required for liability in a Citizens' Suit under the Clean Water Act.

## **STATEMENT OF FACTS**

The Clean Water Act, through the National Pollutant Discharge Elimination System ("NPDES") permit program, authorizes lawful discharges into waters of the United States. 33 U.S.C. §§ 1251(a), 1342. The U.S. EPA authorized the MEDEP to administer the NPDES permit program in 2001, and it does so through its Maine Pollutant Discharge Elimination System permit program.  Am. Compl., Ex. 3 at 4. To that end, Maine has adopted the Maine Net Pen Aquaculture General Permit ("General Permit"). The General Permit was issued in 2014 and is identified as

2

"General Permit No. MEG130000".[2] *Id.* ¶¶ 75–76, Ex. 3. In 2021, the MEDEP approved a modification to General Permit MEG130000 regarding certain sampling protocols of marine sediment (the "Permit Modification"). Am. Compl. ¶¶ 79, 80–82, 105–106, Ex. 4.

Cooke's salmon aquaculture operations take place offshore where the salmon grow to maturity in areas known as "net pen aquaculture facilities." Salmon are grown, raised, and fed in these facilities. Cooke owns and operates 13 separate facilities in Maine waters that are subject to the jurisdiction of the MEDEP and other regulatory agencies.

MEDEP's has issued rules for the operation and management of net pen facilities. These rules recognize each net pen facility site is distinctive, and in several respects, unique. As explained *infra*, to comply with MEDEP regulatory system, Cooke must develop site-specific management regimes and submit those to MEDEP for review and approval. Upon MEDEP's approval, Cooke must operate and manage each facility according to those requirements.

To be authorized under the General Permit, a qualified applicant must obtain MEDEP approval on a facility-by-facility basis through a Notice of Intent regulatory process. Am. Compl., Ex. 3 at 7–10. An applicant first gives public notice of intent to file a Notice of Intent ("NOI"). *Id.* A NOI describes facility specific details on the exact location of the aquaculture facilities with the perimeter of each facility defined by latitude and longitude GPS coordinates, including the net

---

[2] In 2014, the Maine DEP renewed its General Permit for Net Pen Aquaculture that, *inter alia*, included updates such as (i) expanding applicability from only Atlantic salmon to all finfish species, (ii) establishing sulfide standards, (iii) restructuring components for a Best Practical Treatment provision, and (iv) requiring a comprehensive operations and maintenance plan for each facility. Am. Compl., Ex. 3, at 2. When the MEDEP adopted the 2014 General Permit, it published an accompanying Fact Sheet that describes MEDEP's revisions from the prior General Permit. Exhibits other than those subject to a motion to seal are attached to the Affidavit of Timothy C. Woodcock, Esq., ("Woodcock Aff."). *See* Woodcock Aff., Ex. A (the "Fact Sheet"). https://www.maine.gov/dep/water/wd/net-pen-aquaculture/MEG130000-2014fact-sheet.pdf (last accessed September 15, 2025). The Fact Sheet also provides MEDEP's responses to public comments submitted in response to a draft permit. On a motion to dismiss, a court may consider the pleadings as augmented by "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Haley* v. *City of Boston,* 657 F.3d 39, 46 (1st Cir. 2011*)*; *Nat. Resources Council of Maine v. Int'l Paper Co.* 424 F. Supp. 2d 235, 246 (D. Maine 2006).

pens, associated mooring systems, and support platforms at that facility.[3] Additionally, the NOI requires a description of certain proposed operating conditions including sampling locations based upon specific GPS coordinates, feed management, use of chemicals and medications, and a statement that a current Operations and Maintenance Plan ("O&M Plan") has been developed for the facility. *See also* Am. Compl., Ex. 3 at 7–8. When MEDEP approves a NOI, it specifies the maximum number of pens, biomass and density of fish, maximum amount of feed per month, and specific chemical and drug use authorized for the facility. The permit requirements are then in place for that approved facility.

MEDEP approval of a NOI provides a permit to the applicant for a net pen aquaculture facility based upon specific provisions of the NOI and through incorporation of the General Permit provisions. *Id.* The NOI information includes, *inter alia*, a current O&M Plan, and Containment Management System ("CMS") developed for each facility. *Id.* at 7–10, 19. When MEDEP approves a NOI, it issues a distinct permit with its own unique permit identification and each facility is authorized to discharge consistent with its permit requirements.

Cooke's thirteen permitted Atlantic salmon net pen aquaculture facilities ("Facility" or "Facilities")[4] are all operated pursuant to these properly issued permits from the MEDEP (the "Permits"). Am. Compl. ¶¶ 79, 80–82, 105–106; Exs. 3, 4. Although the thirteen separate Permits share some characteristics, they differ with respect to particular site-specific parameters such as location and size and number of net pens, and are identified as follows:

- MEG130029 (Sand Cove) (June 13, 2014) Woodcock Aff., Ex. C;
- MEG130030 (Spectacle Island) (June 13, 2014) Woodcock Aff. Ex., D;

---

[3] DEP Notice of Intent for Coverage of Net Pen Aquaculture under General Permit found at https://www.maine.gov/dep/water/wd/net-pen-aquaculture/net-pen-noi-2014.pdf (last accessed September 15, 2025). *See* Woodcock Aff., Ex. B.

[4] Throughout its Amended Complaint, CLF refers to the net pen aquaculture facilities as "cages." Am. Compl. *passim*. That term is incorrect. The General Permit does not use the word "cage"; rather, Section B of the General Permit provides definitions for "net pen system" and "net pen aquaculture facility or facility." Am. Compl. Ex. 3 at 6. Consistent with the General Permit, this memorandum refers to "facilities."

- MEG130017 (Cutler West) (May 30, 2014) Woodcock Aff., Ex. E;
- MEG130025 (Cross Island) (May 30, 2014) Woodcock Aff., Ex. F;
- MEG130027 (Cross Island North) (May 30, 2014) Woodcock Aff., Ex. G;
- MEG130018 (Deep Cove) (May 30, 2014) Woodcock Aff., Ex. H;
- MEG130028 (Broad Cove) (May 30, 2014) Woodcock Aff., Ex. I;
- MEG130023 (Black Island South) (May 30, 2014) Woodcock Aff., Ex. J;
- MEG130026 (Black Island) (May 30, 2014) Woodcock Aff., Ex. K;
- MEG 130032 (Calf Island) (April 11, 2016) Woodcock Aff., Ex. L;
- MEG130020 (South Bay) (May 30, 2014) Woodcock Aff., Ex. M;
- MEG130001 (Starboard Island) (June 13, 2014) Woodcock Aff., Ex. N; and,
- MEG130024 (Harbor/Scrag Island) (May 30, 2014) Woodcock Aff., Ex. O.[5]

In total, for Cooke, the 13 permits' requirements are collectively found in a separate MEDEP permit issued for each facility that incorporates (i) the General Permit;[6] (ii) Notices of Intent ("NOIs");[7] (iii) an Operations and Maintenance Plan ("O&M Plan"), which in turn incorporates a Feed Management Plan; and (iv) a CMS plan (collectively, the "Permits").[8] These documents cover the General Permit's required aspects of Cooke's normal and proper operation including restocking and grow-out, feed and fish health management, waste management and disposal, and related operations. Am. Compl., Ex. 3 at 10–18.

The O&M Plan must "include provisions to maintain and implement all best practicable treatment requirements prescribed by this General Permit . . . [and] must identify the existence of and date of a feed management plan detailing the permittee's feeding strategies and practices for each growing cycle." Am. Compl., Ex. 3 at 14. These plans, which are all available for inspection by MEDEP, specifically fulfill the General Permit's requirement that each net pen facility must

---

[5] The Exhibits contain the site specific NOI's and Permits, including modifications thereto as well as MEDEP's authorizations and the NOIs for each of Cooke's Facilities.

[6] Am. Compl., Exs. 3 and 4.

[7] Woodcock Aff., Exs. C–O

[8] The O&M Plan, the Feed Management Plan and the CMS Plans contain detailed proprietary operational information and MEDEP does not require submittal of them into the public record. *See* Woodcock Aff., Ex. A, at 23–24 (recognizing the proprietary nature of the operations, MEDEP "has eliminated the requirement to report the composition of fish feed, including trace ingredients . . ."), 40 (Operations and Maintenance Plan containing proprietary practices must be made available to Department personnel for review upon request). In order to provide the Court with the proprietary relevant portions of the Permit, Cooke has filed an accompanying motion to seal, and the Woodcock Affidavit contains blank pages for these exhibits.

use "best management practice" to comply with applicable effluent limitations guidelines described in the General Permit, Section K. Am. Compl., Ex. 3 at 40.[9]

Section E of the General Permit sets the guidelines that govern "discharges" from net pen facilities as follows:

> [a] permittee covered under this General Permit is authorized to discharge: 1) only in accordance with the permittee's Notice of Intent; 2) only in accordance with the terms and conditions of this General Permit; and 3) other pollutants incidental to the normal and proper operation of the facility, including, but not limited to, fish excrement, fish scales, fish carcasses unable to be retrieved, and the leaching of treatment compounds used on nets to limit marine growth, provided such discharges do not cause or contribute to a violation of an applicable water quality standard or condition of this General Permit.

Am. Compl., Ex. 3 at 10.

As described by MEDEP:

> [n]et pen aquaculture activities are conducted by placing fish in a system of one or more free-floating net pens moored in the open ocean. Most fish are introduced as juveniles and raised to adult size for harvest as a commercial food source. … The fish are grown or maintained by adding fish food and, as necessary, medications to the water. …The majority of discharges from a facility are expected to come from fish excrement and unconsumed feed. The discharges increase significantly during the months of August, September and October when the fish are growing more rapidly in response to increased feeding and optimum growing conditions. Medications may be used to combat infectious disease or parasites. The US Food and Drug Administration (USFDA) grants approval for specific uses of medications, although a veterinarian may prescribe an approved drug for a use or rate not described on its approved label. Additionally, the USFDA may authorize the use of Investigational New Animal Drugs (INAD) and aquaculture facilities may wish to use such medications as part of studies of their effectiveness. Other discharges incidental to the

---

[9] Meeting these effluent limitations is accomplished through the Operations and Management Plan that incorporates best practicable control technology known as BPT. The CWA directs the EPA to publish regulations that identify what constitutes a BPT limitation. 33 U.S.C. § 1314(b). The EPA must consider factors including the cost and benefit of the limitation, "the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate." 33 U.S.C. § 1314(b)(1)(B). In 2004, the EPA published BPT effluent limitations for net-pen aquaculture addressing various operational aspects including but not limited to feed management, maintenance, record keeping and waste collection. *See* 69 Fed. Reg. 51892 (Aug. 23, 2004); 40 C.F.R. § 451(B). MEDEP incorporated these regulations into the Permit. Am. Compl., Ex. 3 at 13 ("These conditions are consistent with effluent limitations attainable by the application of the best practicable control technology currently available (BPT) prescribed by 40 CFR § 451.21.").

> operation of an aquaculture facility include fish scales, disinfectants used to prevent the spread of disease, marine growth removed from nets and anti-fouling agents used to treat nets.

*See* Woodcock Aff., Ex. A at 5.[10]

Cooke's O&M Plan and incorporated Feed Management Standard Operating Procedure ("SOP") address feed management including discharges of uneaten fish food and fish feces. Woodcock Aff., Exs. P at 5, and Q at 1. These plans describe the efficient feeding strategies employed to ensure the amount fed is below monthly Permit limits and at the minimum amount reasonably necessary to achieve production goals. Woodcock Aff., Ex. Q at 1. Contrary to CLF's conclusory allegations, Cooke's feed management procedures include hand and equipment feeding with cameras to monitor the feeding, among other things. *Id.* at 3–4. The management procedures avoid waste or uneaten feed as well as excess fish excrement at each stage of growth. *Id.* at 1, 3. Cooke submits monthly reports to the MEDEP detailing the amount of feed distributed. Am. Compl., Ex. 3 at 14. The Amended Complaint does not allege that Cooke has violated monthly Permit limits on the amount of feed provided.

Requisite waste removal procedures, including fish carcasses and trash, are described in Sections A, D, F, and G of the O&M Plan. Woodcock Aff., Ex. P at 3–4, 6. Authorized disease treatment and parasite removal, including any associated authorized discharges of drugs, warm water, organisms, and associated biologic materials (blood, viscera), are also described in the O&M Plan. *Id.* at 3–6.

---

[10] *See also* Woodcock Aff., Ex. A at 23 (recognizing that the primary source of pollution from a net pen is fish feed, control of which is through operation in accordance with the NOI accepted as complete by the MEDEP), 18–19 (recognizing that operations include sediment discharges, blood and viscera, animal carcasses and transport and harvest discharges).

The General Permit also requires certain marine sediment sampling during operations and prior to restocking.[11] Section I of the General Permit requires marine sediment monitoring in accordance with the procedures found in General Permit Appendices A–C to evaluate the impact of discharges to the area beneath the net pen. In 2016, MEDEP issued written guidance for the sampling methodology to be used under Cooke's Permits, s*ee* Woodcock Aff., Ex. R, and in 2021, MEDEP modified Cooke's Permits to incorporate updated methodology into the Permits. Am. Compl., Ex. 4 at 25–37.

The locations and quantities of marine sediment to be sampled are specified in the 2021 Permit Modification.[12] For locations, the NOI identifies specific GPS coordinates. *See* Am. Compl., Ex. 4, Attach. A at 1 ("Cooke Aquaculture marine aquaculture pen site sample locations have been pre-selected and are identified in the Notice of Intent (NOI) or subsequent notifications, for each facility."). These locations are intended to measure sediment quality associated with the Sediment Mixing Zone described in Section H.2 of the General Permit and the sampling locations are (1) at thirty-five meters beyond the perimeter of the overall net pen array at each Facility (measured at two opposite ends of the Facility based on current flows) for the compliance sampling event during operations and (2) five meters from the edge of the overall net pen array prior to restocking. *See* Am. Compl., Ex. 3 at 11.

Inspections conducted by MEDEP demonstrate compliance with the specified sampling locations. *See, e.g.*, Woodcock Aff., Exs. S–EE.[13] For sample volume, contrary to CLF's

---

[11] *See* Am. Compl., Ex. 3 at 12. *See also* Woodcock Aff., Ex. A at 13.

[12] *See* Am. Compl., Ex. 4, Attach. A at 1, 5. The 2021 Permit Modification codifies MEDEP's Marine Sediment Sampling Guidance dated July 25, 2017 updating the 2016 guidance (the "DEP Sampling Protocol"), which modifies the sulfide sampling procedure identified in SM 4500-S2 (Sulfide) authorized by 40 CFR § 136. *See* Woodcock Aff., Ex. R. 40 CFR § 136 includes a list of sampling methods which are approved by EPA for use in the NPDES permitting program.

[13] All existing DEP Inspection reports for the relevant time period are attached as exhibits with one exhibit containing all the reports for each Facility.

allegations, the Permit Modification directs Cooke to work with the selected analytical laboratory on the necessary sample volume needed to conduct the analysis. *See* Am. Compl., Ex. 4, Attach. A at 5.

The General Permit specifies the numeric limits for sulfide, which are (1) a site-average measurement during operations of 3,000 micromoles (μM) or less[14] at 35 meters (average) outside the mixing zone measured at predetermined locations[15] and (2) a restocking site-average threshold at 5 meters of 4,000 μM. Am. Compl., Ex. 3 at 12; Am. Compl., Ex. 4, Attach. A at 1; Woodcock Aff., Ex. A at 3, 11 (MEDEP is "eliminating permit limitations within the mixing zone in favor of a restocking threshold . . ."), 13–14 (describing the revised monitoring structure to achieve BPT and water quality requirements relying upon site averages of samples taken at predetermined locations consistent with MEDEP's goals to eliminate subjectivity), 30 ("perhaps most importantly, the Department is establishing absolute numeric standards for benthic community rather than relying on a comparison to reference site data" thereby establishing "an objective standard up front [which] eliminates subjectivity and uncertainty associated with evaluating each data set on a case-by-case basis to determine compliance with applicable water quality standards."). Cooke has consistently been in compliance with the required sampling and within the acceptable detection levels and CLF does not allege any such violations of those specific parameters. *See* Am. Compl. ¶¶ 193–210.[16]

---

[14] *See* Woodcock Aff., Ex. A at 34 ("the Department is reverting to the sulfide limit of 3,000 μM utilized in the 2008 general permit as an indicator of benthic condition transitioning from normal to polluted.").

[15] *See* Woodcock Aff., Ex. A at 33 ("the Department has made a determination that compliance with benthic standards established in the general permit should be assessed based on the average of all sampled *(sic)* collected at the designated stations beyond the mixing zone.").

[16] CLF's attempt to establish sampling violations in 2023 ignores that the required average of the samples taken at the predetermined 35 meter locations was only 2,564 μM, which is below the requisite threshold of 3,000 μM. Am. Compl. ¶ 211. CLF also tries to use an incomplete copy of the requisite report, Am. Compl., Ex. 5, and in so doing, fails to include the portion of the report that states Cooke has complied with all aspects of the Permits' required sampling protocols. *See* Woodcock Aff., Ex. FF.

The required CMS plan, which is to be designed, constructed, operated and audited to address the risk that fish might escape from the net pen facilities. Am. Compl., Ex. 3 at 19. Each Facility has a site-specific CMS plan developed in coordination with multiple stakeholders including the MEDEP, the Maine Department of Marine Resources, the U.S. Army Corps of Engineers, the National Marine Fisheries Service, and the United States Fish & Wildlife Service. Am. Compl., Ex. 3 at 19–20. The CMS addresses the General Permit's provisions concerning the prevention of accidental release of fish, predator control procedures, inventory control procedures, including mortality monitoring, and record-keeping, among other things. At a minimum, all CMS's pertaining to net pens stocked with fish during that calendar year must be audited annually by an independent third-party auditor. Am. Compl., Ex. 3 at 18.

CLF alleges predator attacks occurred in 2020 and 2023, however, the Complaint fails to allege sufficient facts to raise a plausible inference that those attacks resulted in the Permits' prohibited **intentional** discharge of fish. Am. Compl., Ex. 3 at 19 (emphasis supplied). The alleged four (4) attacks in 2020 led to no discharge of fish and the alleged two (2) attacks in 2023 resulted in the complete loss of stock. Woodcock Aff., Exs. TT–ZZ. Any accidental release of fish due to these isolated events is not a violation of Cooke's Permits.

Lastly, the General Permit includes several reporting requirements identified in Appendix F. Am. Compl., Ex. 3 at 30. These include monthly Feed and Fish Reports, Standing Inventory Reports, Drug Treatment Reports, and an annual written report of each annual CMS Audit, among others. Am. Compl., Ex. 3 at 14, 20, and 17. Feed and Fish reports include the number of pens in use, the number of months each pen has been stocked, the average weight, total number, total volume, total biomass, and total density of fish for each pen, and the total amount of feed added to each pen that month. *Id*. at 14. When drugs are used, monthly drug use reports are required by

10

Section N.5 of the General Permit and must include the number of days of application, the drug used, the concentration administered, the approximate number of fish and pens treated, the method of application, and the condition treated. *Id*. at 17. Standing Inventory Reports are required by General Permit Section O.6.g which includes "all transfers in and out, losses associated with disease, predation or escapes as reported to the Department of Marine Resources at the pen level of detail." *Id.* at 20. While CLF alleges that a few reports have been submitted in an untimely fashion, it provides no specific information concerning alleged inaccurate reporting. Am. Compl. ¶¶ 2, 88–91, 272, 299, 304, 353, 363–366.

Pursuant to the Permits, MEDEP conducts regular inspections of each of Cooke's Facilities employing a checklist corresponding to the relevant Permit requirements.[17]  These reports include a review of the NOI description (Section D), dissolved oxygen concentration results (Section H), sulfide sediment monitoring results (Section I), visible discharge limitations (Section J), compliance with BPT requirements (Section K), review of the O&M Plan (Section L), predator and containment nets (Section M), drug use (Section N), protection of Atlantic Salmon (Section O), sediment and benthic monitoring (Appendix A), and spill prevention (Standard Condition E). These inspection reports demonstrate widespread compliance with the obligations of the Permits, with only a few isolated infractions identified, all of which were promptly corrected. *See, e.g.,* Woodcock Aff., Ex. DD (Starboard Island inspection dated May 31, 2023 indicated a copy of the current O&M Plan was not onsite).

---

[17] Copies of all reports for inspections that MEDEP conducted for each of the thirteen Facilities from 2020 to 2025, are grouped by Facility to the Woodcock Aff., Exs. S–EE.

## ARGUMENT

## STANDARD OF REVIEW

To withstand a motion to dismiss under Rules 12(b)(1) and 12(b)(6), a claim must "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). The complaint must include "factual content that allows the court to draw a reasonable inference" in the pleader's favor. *Katz v. Pershing, LLC*, 672 F.3d 64, 73 (1st Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Nor do efforts to "camouflage conclusory statements" as factual allegations. *A.G. ex rel. Maddox* v. *Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013) (efforts to "camouflage conclusory statements as allegations of fact" fail to meet Rule 8 requirements). And, where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Twombly*, 550 U.S. at 557. Well-pleaded facts that "do not permit the court to infer more than the mere possibility of misconduct" do not entitle the pleader to relief. *Iqbal*, 556 U.S. at 679.

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is subject to the same standard of review as a motion to dismiss under Rule 12(b)(6). *See United States v. AVX Corp.*, 962 F.2d 108, 114 n.6, 114–115 (1st Cir. 1992). "Federal courts are obliged to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case." *Acosta–Ramirez* v. *Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013).

I.    **The Amended Complaint Does Not Allege Sufficient Facts to Meet Article III Standing Requirements.**

CLF describes itself as a "nonprofit, member-supported, regional environmental advocacy organization" with 5,958 members, including 486 members in Maine. Id. at ¶¶ 16, 18. CLF does

not allege any personal interest whatsoever in the immediate vicinity of any of Cooke's Facilities. *See generally,* Am. Compl.

Accordingly, CLF must establish legally sufficient associational standing. An association such as CLF has Article III standing to bring an action based on injuries to its members' interests. "Even in the absence of injury to itself an association may have standing solely as the representative of its members." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 341 (1977), quoting *Warth v. Seldin*, 422 U.S. 490, 498-499 (1975). But, CLF has standing *only if*, among other requirements, "at least one of its members would have standing to sue as an individual." *Draper* v. *Healey*, 827 F.3d 1, 3 (1st Cir. 2016).

Therefore, CLF's standing is dependent on competent allegations of actual or threatened injury to its members. In addition, because each of Cooke's 13 Facilities is subject to its own Permit, the Amended Complaint must present legally competent allegations that at least one of its members is experiencing actual harm or is at risk harm with respect to **each** Facility. The Amended Complaint fails entirely to do so.

### A.  Legal Requirements for Article III Individual Standing

With respect to each of the claims brought for each of the 13 Facilities, an association must plead that its members, as individuals, have (1) suffered a particularized and concrete "injury in fact," (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Ctr. for Biological Diversity v. United States Dep't of the Interior*, 144 F.4th 296, 305, 309 (D.C. Cir. 2025) (Where natural gas wells were alleged to cause injuries, "[w]e decline to 'hunt[ ] for truffles buried in ... the record' to draw the concrete links between individual injuries and individual wells that Plaintiffs have neglected to unearth in their own submissions."). Complaints warrant dismissal

13

where the alleged "injury in fact" contains "[g]auzy generalities . . . unsubstantiated by any sort of factual foundation." *United States v. AVX Corp.*, 962 F.2d 108, 117 (1st Cir. 1992).

The complaint must allege sufficient facts to show that a plaintiff has a "personal stake" in the claims raised. *Pagan v. Calderon*, 448 f.3d 16, 26 (1st Cir. 2006). This means that the Plaintiff must have suffered or be under imminent threat of harm. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). To meet this standard, the complaint must allege "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560. In short, the "asserted injury [must be] …. anchored in any relevant particulars." *United States v. AVX Corp.*, 962 F.2d 108, 117 (1st Cir. 1992); *see also CLF v. Continental Paving Inc*., 2016 WL 7116019, (D.N.H. Dec. 6, 2016) (finding standing but only because CLF included declarations from its plaintiffs attached to the complaint which met the standard set in *U.S. v. AVX*).

Additionally, where allegations as to what is "fairly traceable to the challenged conduct," or causation, warrant dismissal when a reasonable and plausible inference is lacking. *See Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp*., 95 F.3d 358, 361 (5th Cir. 1996) ("FOE and its members relied solely on the truism that water flows downstream and *inferred* therefrom that any injury suffered downstream is "fairly traceable" to unlawful discharges upstream. At some point this commonsense observation becomes little more than surmise."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This means that the Complaint must "show a sufficiently direct causal connection between the challenged action and the identified harm." *Katz v. Perhsing, LLC,* 672 F.3d 64, 71 (1st Cir 2012).

"[S]tanding 'cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record.'" *Tennessee Riverkeeper v. Waste Connection of*

*Tennessee, Inc.*, 769 F. Supp. 3d 784, 791 (M.D. Tenn. 2025) (citing *Bearden v. Ballad Health*, 967 F.3d 513, 518 (6th Cir. 2020)). "[N]or will 'naked assertion[s] devoid of further factual enhancement' suffice." *Id.* (citing *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))."

Each of Cooke's 13 Facilities, which are located in separate and distinctive locations, is operated and maintained under a specific Permit tailored to each Facility. Am. Compl. ¶¶ 60-73. To establish standing, CLF must fulfill the requirements as to each of the 13 individual Permits issued to Cooke's Facilities.

### B.  CLF's Amended Complaint Fails to Meet Article III Standing Requirements

A review of the Amended Complaint reveals that it has failed to identify a single member who has been harmed or is at imminent risk of harm due to Cooke's maintenance and operations of at any of Cooke's 13 Facilities. Not one single member is identified who has been harmed or who is at imminent risk of being harmed due to Cooke's alleged unauthorized discharges, improper sampling or untimely or inaccurate reporting at any, let alone all, of Cooke's 13 Facilities. To the contrary, the Amended Complaint has relied on averments with no substance such as unnamed "members," who claim a variety of impacts at unspecified time(s) and unspecified locations. Am. Compl. ¶¶ 309–314. The alleged injuries range from "concern" about Cooke's alleged pollution, Am. Compl. ¶ 311; lobster fishermen who allege their traps in undefined locations are covered in "black sludge," Am. Compl. ¶¶ 309–310; and picking up trash allegedly from Cooke's facilities on unnamed beaches and surrounding areas, Am. Compl. ¶ 314.

These general allegations do not establish the requisite "connection" between "the identities" of CLF's members and "the relevant geographic area" allegedly suffering from environmental harm. *United States* v. *AVX Corp.*, 962 F.2d 108, 116–17 (1st Cir. 1992). The First Circuit long ago rejected this type of generic allegation, even where a complaint contains more

specific allegations than those raised here. For example, in *AVX Corp.*, the court affirmed the dismissal of a complaint where an association alleged that its members (i) "use and enjoy" the environment and natural resources in the New Bedford Harbor area," and (ii) "have been and will continue to be harmed" by the pollutants that are the subject of the litigation. *AVX Corp.*, 962 F.2d at 116.

Additionally, the Amended Complaint fails to provide legally sufficient allegations to establish that any injuries alleged is traceable to the alleged conduct at issue. Simply, the allegations are devoid of the requisite factual support, instead, the Amended Complaint contains conclusory allegations that Cooke is violating its Permits with its discharges of uneaten food,[18] fish feces/excrement,[19] dead fish (whole or in pieces),[20] diseases, parasites, viruses (ISA, RSA, ERM, and BKD),[21] sea lice,[22] escaped fish,[23] warm water,[24] biologic materials (blood, viscera),[25] and chemicals.[26] CLF further recites various operational requirements of the Permits and then asserts that Cooke is violating them without any particular, well-supported, plausible factual allegations. Examples of this deficient pleading include the Amended Complaint's assertions that Cooke failed to comply with feed management protocols; sprayed salmon with undisclosed chemicals including "possibly" hydrogen peroxide; engaged in improper net cleaning practices; reported holes in its containment nets that allowed salmon to escape, and (including upon information and belief that salmon escaped). Am. Compl. ¶¶ 115–119, 147, 151–153, 158–162.

---

[18] Am. Compl. ¶¶ 55–56, 114, 121, 184, 242–245, 309–310, 333–334, 337, and 355–356.
[19] Am. Compl. ¶¶ 55, 121–122, 184, 242–245, 309–310, 333–334, and 337.
[20] Am. Compl. ¶¶ 2, 55, 58, 85–86, 123–129, 154, 184, 242–245, 309–310, 316, 333–334, 337, and 359–362.
[21] Am. Compl. ¶¶ 55, 130–139, 144, 154–155, 246–260, 330–332, 346, 348–349, and 350–352.
[22] Am. Compl. ¶¶ 2, 140–146, 248–254, 330–332, 346, and 348–352.
[23] Am. Compl. ¶¶ 157–171, 262–265, 330–332, and 346–349.
[24] Am. Compl. ¶¶ 85, 146, 150, 261, 330–332, and 350–352.
[25] Am. Compl. ¶¶ 85, 359–360 and 362.
[26] Am. Compl. ¶¶ 147, 150–153, 154–156, 317, and 330–332.

The Amended Complaint further offers broad, unsupported allegations about "trash" found on beaches, "black sludge" on lobster traps, and "pollution" in the Atlantic Ocean is comprised of unauthorized discharges from Cooke's net pen Facilities. Am. Compl. ¶¶ 1, 2, 172–173, 266–271, 309, 311–315, 348. Yet, there is absolutely no information linking what has allegedly been found over to Cooke's specific thirteen Facilities. Even when CLF attempts at times to soften its bald assertions with "on information and belief," examination of the same demonstrates that the allegations are still based solely on unacceptable speculation and conjecture. Specifically, a reference to a die-off of fish in 2024 leads CLF to assert that Cooke "repeatedly" discharges dead fish and fish pieces, Am. Compl. ¶ 129; the mere detection of the disease ISA in seventeen wild salmon leads CLF to assert that the disease came from a Cooke Facility, Am. Compl. ¶¶ 138–139; four alleged disease outbreaks in two of Cooke's Facilities in 2021 and 2022 leads to allegations that all of Cooke's Facilities regularly experience disease outbreaks, Am. Compl. ¶¶ 130–135; alleged (and inaccurate) statements about Cooke not complying with prescribed sampling methods and locations leads CLF to speculate that had its method and locations been used for sampling, the results would have exceeded relevant permit thresholds, Am. Compl. ¶¶ 212–214, 240–241; completely unsupported allegations of discharge of sea lice leads CLF to allege that Cooke is infecting wild salmon with sea lice, Am. Compl. ¶ 248; and completely unsupported allegations of misrepresentation of mortalities and the number of fish in pens leads CLF to assert that Cooke has a "pattern and practice" of misrepresentation, Am. Compl. ¶ 304. No reasonable inference can be drawn in support of CLF's allegations when they are pulled from thin air and standing cannot be predicated on them.

Tellingly, the two times that CLF actually provides some particular information pertaining to alleged discharges are when the discharges are authorized under the Permit. In two paragraphs,

CLF alleges that on an unspecified date in an unspecified location, its members "have observed Cooke discharging brown, foul-smelling water from de-lousing boats," and spraying its cages with a "chemical-smelling spray." Am. Compl. ¶¶ 317–318.[27] These activities allegedly cause CLF members concern for impact on the water and the marine ecosystem. *Id*. But neither of these observations confer standing as there is no allegation that the discharges are unauthorized and, as set forth below, they are, in fact, authorized. *See* Argument Section III.A, *infra*. Moreover, the unnamed members' "concerns," are not a sufficiently particularized injury that fulfills the requirements for Article III standing.

## II.    Count I Fails Because CLF Alleges Violations of Unenforceable Standards

Count I alleges that Cooke has violated narrative standards set forth in the General Permit. Am. Compl. at ¶¶ 329–339. Yet, these claims are contrary to the Supreme Court's recent holding in *SF v. EPA*. CLF seeks relief for alleged violations of narrative standards that turn on the quality of the receiving waters and do not tell Cooke what must be specifically done to comply with its Permits. *See City & Cnty. of San Francisco, California v. Env't Prot. Agency*, 604 U.S. 334 (2025) ("*SF v. EPA*"). NPDES permits may not impose "requirements that condition permit holders' compliance on whether receiving waters meet applicable water quality standards." *Id.* at 345, 346. Additionally, NPDES permits cannot contain requirements prohibiting discharges that generically cause broadly defined impacts such as "pollution, contamination, or nuisance" because the permit holder can only control its discharge. *Id.* at 342, 346-347. These standards are unenforceable. *Id*.

Conditioning permit compliance on the quality of the receiving waters is unenforceable because a permit needs to "spell out what a permittee must do or refrain from doing." *Id.* at 338. Conditioning compliance on the quality of the receiving waters provides no such information. *See*

---

[27] While chemicals are authorized for use at the Facilities, they have not been used to clean nets for the period 2020 to date. *See* Woodcock Aff., Exs. S–EE at 3 in each report.

*id.* A permit that conditions compliance on the quality of the receiving waters also may penalize a permittee for drops in water quality not attributable to the permittee. *Id.* at 349-352. Water bodies, such as the ocean, are vast, and face sources of pollution both natural and human-induced, all of which can affect the water quality unrelated to the permittee's conduct. *See id.*

Similarly, provisions in a permit that condition compliance on broadly defined impacts are unenforceable. *Id.* at 346-347. The Supreme Court found specifically that a permittee was not legally required to comply with a permit that forbade discharges that caused contamination, pollution, and nuisance, *id.*, which were defined to include impacts ranging from "a hazard to the public health," to "unreasonably affects waters for beneficial uses," to "indecent or offensive to the senses," Cal. Water Code § 13050.[28] Again, these types of requirements fail to inform a permittee what needs to be done to avoid these results. Instead, the Supreme Court held that "the EPA possesses the expertise . . . and the resources necessary to determine what a permittee should do," and a permit must spell out that information. *SF v. EPA* at 353.

A key aspect to the Clean Water Act is the defense of the permit shield that protects permittees from alleged violations if they are in compliance with their permits. *SF v. EPA* at 341, 349-352. If either of these two (2) types of requirements were enforceable, the Permit Shield would be "eviscerated." *See id.* at 349-352; *see also* 33 U.S.C. § 1342(k). A permittee cannot comply with a permit that does not explain what it must do, nor with a permit that penalizes the permittee

---

[28] The CA statute states: "(k) "Contamination" means an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease. "Contamination" includes any equivalent effect resulting from the disposal of waste, whether or not waters of the state are affected. (1) "Pollution" means an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following: (A) The waters for beneficial uses. (B) Facilities which serve these beneficial uses. (2) "Pollution" may include "contamination." (m) "Nuisance" means anything which meets all of the following requirements: (1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. (2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. (3) Occurs during, or as a result of, the treatment or disposal of wastes."

for the discharges of others. Recognizing that these standards are "unlawful under the Clean Water Act," EPA is already "remov[ing] generic narrative prohibitions[s]" and replacing them "with final water quality-based limitations that tie compliance to the condition of the discharge (not the receiving water)." 90 Fed. Reg. 15653, published Apr. 15, 2025.

In Count I, CLF fails to tailor its allegations to eliminate the same type of claims which were rejected in *SF v. EPA*. *See* Am. Compl. ¶¶ 328, 346. Count I alleges violations of General Permit Sections H ("Mixing Zone,"), J.1, and J.2 ("Narrative Limitations"). Am. Compl. ¶¶ 328–338. In addition to warranting dismissal because CLF does in fact comply with these Permit Sections and CLF fails to plausibly allege any actual violations. *See* Argument Standard of Review, *supra.* Count I should be dismissed to the extent it alleges violations of Permit provisions that attempt to make Cooke "responsible for the quality" of the receiving waters rather than focusing on the discharge itself and "do not spell out what a permittee must do or refrain from doing," *SF v. EPA* at 338.

### A. Count I Fails To The Extent It Conditions Compliance On The Quality Of The Receiving Waters.

In Count I, CLF alleges violations of various provisions of General Permit Sections H, J.1, and J.2, all of which condition compliance with the permit on the quality of the receiving waters. Section H states that dissolved oxygen levels "must comply with the applicable standards specified at *Standards for classification of marine and estuarine waters*, 38 M.R.S.A. § 465-B." That statute, in turn, states:

> [d]ischarges to Class SB waters may not cause adverse impact to estuarine and marine life in that the receiving waters must be of sufficient quality to support all estuarine and marine species indigenous to the receiving water without detrimental changes in the resident biological community.

38 M.R.S.A. § 465-B(2)(c). In other words, discharges must not impact the receiving waters' ability to support indigenous species.

Similarly, Permit Sections J.1 and J.2 state:

**J. NARRATIVE LIMITATIONS**

> Outside the designated mixing zone, discharges from the facility must not cause or contribute to a violation of water quality standards, including the following narrative standards.
>
> 1. The permittee must not discharge pollutants that cause a visible oil sheen, foam, or floating solids at any time that would impair the uses designated by the classification of the receiving waters.
>
> 2. The permittee must not discharge pollutants that contain materials in concentrations or combinations that are hazardous or toxic to aquatic life, or that would impair the existing or designated uses of the receiving waters.

These provisions that turn on the quality of the receiving waters are unenforceable. *SF v. EPA* at 337-338. Rather, Cooke can only be held accountable for its discharges. But these provisions do not turn on Cooke's discharges and therefore, to the extent Count I relies on unenforceable provisions, Count I fails.

**B. Count I Fails To The Extent It Relies On Permit Provisions That Do Not Explain What Cooke Must Do.**

Count I also alleges violations of General Permit Section H for "causing or contributing to conditions that are hazardous or toxic to aquatic life" and by "caus[ing] or contribut[ing] to lethal conditions inside" the net pens. Am. Compl. ¶ 338. Akin to the circumstances in *SF v. EPA*, CLF's allegations attempt to require Cooke to operate based upon broadly defined impact rather than informing Cooke what it can or cannot do. General Permit Section H states in relevant part:

**H. MIXING ZONE**

> This General Permit designates two mixing zones: (1) a Water Column Mixing Zone, and (2) a Sediment Mixing Zone. Outside the designated Mixing Zones, discharges from the facility ***must not cause or contribute to conditions that are hazardous or toxic to aquatic life, or that would impair the uses designated***

21

> *by the classification of the receiving waters. **Within the designated mixing zone, the discharge must not cause or contribute to conditions that are lethal to passing organisms indigenous to the receiving water***.

Am. Compl., Ex. 3 at 11 (emphasis added). Conditioning compliance on standards of "hazardous or toxic to aquatic life" or "lethal" to indigenous organisms is exactly the type of standard the Supreme Court found unenforceable. There is no information provided to the permittee on what it must do to avoid creating these conditions and therefore comply with the permit. *See SF v. EPA* at 337-338, 353-354. CLF may not seek to enforce those standards.

In its attempt to find violations where they do not exist, CLF also ignores the specific and enforceable compliance requirement set forth in Section H. Section H states specifically that "[t]he dissolved oxygen concentration within the water column mixing zone must not be lower than 6 mg/L at any point from the surface down to the sea floor/water column interface." Am. Compl., Ex. 3 at 11. CLF, however, does not allege that Cooke has violated this particular provision of the permit,[29] relying instead on the unenforceable narrative limitations that undefined "low levels of dissolved oxygen resulted in "lethal" or "toxic" circumstances. *See* Am. Compl. ¶¶ 124 (alleging die-off event in 2021 due to low levels of dissolved oxygen), 242 (alleging "low-oxygen conditions lethal to passing marine life"), 337 (alleging "low dissolved oxygen directly beneath the pens to be toxic to aquatic life"); *see also generally* Am. Compl. ¶¶ 328–336, 338. CLF's claim fails to the extent it relies on this language.

## III.    The Permit Shield Bars CLF's Claims In Counts I, II, III, IV, and V Because Cooke Is In Compliance with its Permits.

It is black letter law that compliance with a NPDES permits is compliance with the CWA. *SF v. EPA* at 341, 350. This doctrine, known as the permit shield, "relieve[s] [permit holders] of

---

[29] Cooke complies with the dissolved oxygen requirements of the Permits.  *See* Woodcock Aff., Exs. S–EE at 1 in each report.

having to litigate . . . the question whether their permits are sufficiently strict." *E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977). The Permit Shield "serves the purpose of giving permits finality." *Id.*

A permittee must be on notice of what is required by their permit before it can be held liable for violations of that permit. *Cf. SF v. EPA* at 338 ("if [end-result] provisions are upheld, the [permittee] could be heavily penalized even though it was never put on notice that it was obligated to take any specific step other than those it undertook"); *see also Wisconsin Resources Protection Council v. Flambeau Min. Co.*, 727 F.3d 700 (7th Cir. 2013) (reversing findings of CWA violations for discharging without a permit where permittee was led to believe its mining permit was sufficient for compliance with CWA). Compliance with a permit is not limited to the express terms of the permit. Even discharges not explicitly contemplated by a permit are protected by the Permit Shield when "an individual polluter . . . meets the disclosure requirements for a particular pollutant and the discharge of the pollutant at issue was within the authority's reasonable contemplation at the time the general permit was issued." *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 290 (6th Cir. 2015) at 290.

CLF's allegations that Cooke violates its Permits through unlawful discharges and use of inappropriate sampling protocol are all belied by the actual terms of Cooke's Permits and Cooke's compliance therewith, and broad, unsupported and even misleading allegations fail to suffice to support a claim.  *A.G. ex rel. Maddox* v. *Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013).

### A.  Cooke's Discharges are Authorized Under its Permits

While CLF acknowledges that discharges are explicitly authorized under Cooke's Permits, Am. Compl. ¶¶ 30, 78–80, it then ignores the authorization and asserts with absolutely no support

23

in Counts I, III and V that Cooke is violating its Permits with its discharges of uneaten food,[30] fish feces/excrement,[31] dead fish (whole or in pieces),[32] diseases, parasites, viruses (ISA, RSA, ERM, and BKD),[33] sea lice,[34] escaped fish,[35] warm water,[36] biologic materials (blood, viscera),[37] and chemicals.[38] Further ignoring the Permits, CLF attempts to support these allegations generically based upon "[q]ualitative observations of the sediment" as "evidence of …poor ecological quality."[39] MEDEP could not be clearer in rejecting visual observations as a basis for determining Permit compliance. *See* Woodcock Aff., Ex. A at 3 (MEDEP is eliminating video/photographic monitoring and reporting requirements), 12 ("Since 2003, the video records have been proven to result in highly subjective determinations of permit compliance and interpretation, …"), 31 ("The Department agrees with MEDMR that video monitoring is a useful tool for operational management of the site, but not as a regulatory compliance mechanism in the general permit.").

Photographic "support," is similarly irrelevant and CLF's attempt to rely on selective portions of Cooke's Marine Sediment Monitoring Reports is misleading and deficient. *See* Am. Compl. Ex. 5. The General Permit has specific objective numeric monitoring requirement for dissolved oxygen in the Water Column Mixing Zone. Am. Compl., Ex. 3 at 11. Similarly, "high sulfur levels" as alleged (Am. Compl. ¶¶ 215–216) are specifically regulated by the sulfide sampling requirements, including the annual sampling and restocking requirements. Am. Compl., Ex. 3 at 10, 12. Photos of sediment submitted by the laboratory providing the required sulfide

---

[30] Am. Compl. ¶¶ 55–56, 114, 121, 184, 242–245, 309–310, 333–334, 337, and 355–356.
[31] Am. Compl. ¶¶ 55, 121–122, 184, 242–245, 309–310, 333–334, and 337.
[32] Am. Compl. ¶¶ 2, 55, 58, 85–86, 123–129, 154, 184, 242–245, 309–310, 316, 333–334, 337, and 359–362.
[33] Am. Compl. ¶¶ 55, 130–139, 144, 154–155, 246–260, 330–332, 346, 348–349, and 350–352.
[34] Am. Compl. ¶¶ 2, 140–146, 248–254, 330–332, 346, and 348–352.
[35] Am. Compl. ¶¶ 157–171, 262–265, 330–332, and 346–349.
[36] Am. Compl. ¶¶ 85, 146, 150, 261, 330–332, and 350–352.
[37] Am. Compl. ¶¶ 85, 359–360 and 362.
[38] Am. Compl. ¶¶ 147, 150–153, 154–156, 317, and 330–332.
[39] Am. Compl. ¶¶ 215–216, and Ex. 5.

analysis have no impact on assessment of the required levels. *Id*. CLF's attempts to turn these photos into violations by alleging generally that the appearance of the sediment somehow demonstrates a violation of the sulfide and dissolved oxygen limits should be rejected. *See* Am. Compl. ¶¶ 215–216; Am. Compl., Ex. 3 at 11.

Apart from its attempt to use improper visual observations, CLF presents nothing other than legally deficient conclusory allegations that Cooke is violating its Permits with discharges. CLF's bare allegations are wholly insufficient to plead viable violations. *See* Argument Standard of Review, *supra; Douglas v Hirshon* 63 F.4th 49, 55 (1st Cir. 2023) (we do not credit 'conclusory legal allegations' [or] factual allegations that are 'too meager, vague or conclusory to remove the possibility of relief from the realm of mere conjecture.'"). Moreover, the General Permit specifically identifies various discharges as authorized because they are incidental to the normal and proper operation of the facility, including, *but not limited to*, fish excrement, fish scales, fish carcasses unable to be retrieved, leaching of treatment compounds used on nets to limit marine growth, and discharges associated with the transport or harvesting of aquatic animals including blood, viscera, aquatic animal carcasses, or transport water containing blood. Am. Compl., Ex. 3 at 10, 13–14 (emphasis supplied).

Cooke's operations as described in its Permits and accompanying plans and audits further demonstrate Cooke's compliance with its Permits. Discharges of uneaten feed and fish excrement (feces) are permitted as normal operation of the Facility when managed pursuant to feeding strategies and associated technologies described in Cooke's plans and procedures. *See* Am. Compl., Ex. 3 at 10, 13, 18; Woodcock Aff., Ex. A at 5 (description of Permitted Activities includes unconsumed feed and fish excrement), 23 (fish feed is controlled through operation in accordance with the NOI accepted as complete by the MEDEP). The O&M Plan and accompanying Feed

25

Management SOP 14 specifically describe MEDEP approved procedures for controlling uneaten feed, including employing dynamic video monitoring. *See* Woodcock Aff., Ex. Q at 4. Moreover, the required monthly Fish & Feed Reports require reporting the "total amount of feed added to each net pen", which is limited by the terms of the individual Permits. *See* Woodcock Aff., Exs. C–O. Cooke complies with the Permits limitations on feed provided, and CLF alleges no facts to the contrary or that Cooke otherwise does not comply with applicable plans.

Similarly, Section E of the General Permit expressly recognizes that fish carcasses unable to be retrieved are permitted discharges. In fact, when renewing the 2014 General Permit, MEDEP relied on 40 CFR § 451.21 and specifically "concluded that prescribing the removal frequency [for fish carcasses] was inappropriate and was better left to the permittee to incorporate into facility plans." Woodcock Aff., Ex. A at 27. Cooke has done just that and manages fish carcasses through the procedures and protocols contained in Section D of the O&M Plan which describes the collection frequency and procedure for transporting fish carcasses to approved composting facilities. Woodcock Aff., Ex. P, at 4–5.

The Permits also authorize use of all drugs contained on a list "proposed for use at the facility, and the duration, route of administration and concentration of each application," as well as identified "disinfectants, biocides, anti-fouling agents or other similar compounds proposed for use at the facility." Am. Compl., Ex. 3 at 8. MEDEP recognized that all such discharges are (1) not "toxic,"[40] (2) consistent with "boilerplate narrative limitation language," and (3) "consistent with 40 CFR § 451.21(c)." *Id.* at 18–19. CLF fails to identify specific discharges of chemicals or drugs

---

[40] *See* Woodcock Aff., Ex. A at 28 ("Net pen aquaculture facilities are not a source of routine discharges of toxic pollutants.").

not permitted by the Permits and its conclusory unsupported assertions that Cooke discharges "undisclosed" chemicals have no merit.[41]

The Amended Complaint also misstates how a permittee complies with BPT limitations and its attempt to allege that Cooke is violating its Permits regarding discharges of various substances subject to certain best management plans.[42] BPT limitations require implementation of certain best management practices contained in plans and procedures adopted to meet the requirements. The federal regulations state the requirements are "expressed as practices … *as determined by the permitting authority* based on its exercise of its best professional judgment …." *See* 40 C.F.R. § 451.21 (emphasis added). In so doing, the EPA rejected establishment of numeric effluent limitations and physical treatment systems. *See* 69 Fed. Reg. 51892, 51910 (Aug. 23, 2004). All of these discharges are of a type incidental to the normal and proper operation of the facility authorized by Section E of the General Permit provided that Cooke maintains an O&M Plan to address them, which Cooke does, and the plan is available as required for MEDEP review, which it is. *See* Am. Compl., Ex. 3 at 14 (required O&M Plan "must include provisions to maintain and implement all best practicable treatment requirements" and "must be made available to Department personnel for review upon request").[43] The Amended Complaint does not allege the contrary.

The Amended Complaint also alleges that escaped fish somehow constitute an unauthorized discharge.[44] However, General Permit Section O.5 only prohibits the "intentional release of fish." Am. Compl., Ex. 3 at 18–21. The fact that predators sometimes damage nets

---

[41] *See* Am. Compl. ¶¶ 147, 150–156, 317, 330–332.
[42] *See* Am. Compl. ¶¶ 83–87, 355–362.
[43] MEDEP specifically reviews the O&M Plan as part of its periodic inspections. *See* Woodcock Aff. Exs. S–EE at 3 in each report.
[44] *See* Am. Compl. ¶¶ 157–171, 262–265, 330–332, and 346–349.

causing holes through which fish escape is clearly not an intentional release on the part of Cooke. And operations to release predators as part of the means to avoid or manage them from causing harm to the fish or Facilities is clearly an authorized discharge as it is incidental to the operation of the Facilities and permitted by Section E of the General Permit. *See* Woodcock Aff., Exs. GG–SS (CMS Plans at Sections 4.3 and 4.4). Yet, the Amended Complaint goes even further and claims "upon information and belief" that Cooke "discharged escaped fish" during these events. Am. Compl. ¶¶ 160–162 (holes reported in 2020 at Cutler West and Calf Island); ¶¶ 169–171 (identifying three alleged isolated incidences of Cooke supposedly lowering nets to release seals in 2020). However, this allegation is demonstrably deficient because, while Cooke reported holes at Calf Island and Cutler West, there was "no apparent indication any fish escaped" at Calf Island and it "appeared no fish escaped" on October 14, 2020 and "no apparent loss of fish" on November 3, 2020 at Cutler West. *See* Woodcock Aff., Ex UU at 3; Ex. TT at 3. Similarly, alleged lowering of nets in 2020, which did not actually occur,[45] also resulted in no discharge of fish. *See* Woodcock Aff., Ex WW at 3; Ex. VV at 3.

Most importantly, as required by the Permits, **each** net pen facility is subject to its own, specific and detailed "Containment Management System" developed in coordination with multiple stakeholders. Am. Compl., Ex. 3 at 19–20; *See also* Statement of Facts, *supra*. These plans govern the procedures in place to prevent the accidental release of fish, predator control procedures, inventory control procedures, including mortality monitoring, and record-keeping, among other things. In addition to the annual independent audit required for all facilities stocked with fish, Am. Compl., Ex. 3 at 19, the "known or suspected escape of 25% or more of a cage population and/or more than 50 fish with an average weight of two (2) or more kilograms each" must be reported

---

[45] Predator nets surround the nets that maintain the growing fish and fish are not maintained within that space. *See*, Woodcock Aff., Exs. GG–SS at Section 4.3 in each report.

within 24 hours of knowledge of such an event. CLF's allegations regarding escaped fish simply demonstrate Cooke is complying with its permit obligations in accordance with its required CMS Plans and that some escapes are authorized under the Permits. *See* Am. Compl. ¶¶ 157–171.

Each of the specific events referenced regarding holes in nets[46] and predator damage[47] was properly reported and resolved in accordance with the Permit. *See, e.g.,* Woodcock Aff., Exs. TT–ZZ. Yet, while publicly available, the Amended Complaint does not acknowledge these documents nor does it set forth allegations that contradict them or place them in doubt.

The Amended Complaint also claims that to the extent the discharges originate from vessels, barges or docks servicing the net pen facilities, they are unpermitted point sources. *See* Am. Compl., at ¶¶ 350–354. These allegations conflict with the fact that the Permits govern **all** the facilities identified in the NOIs, which specifically includes nine barges. The Amended Complaint also fails to acknowledge and account for the legal fact that these discharges are contemplated in the Permits as incidental to the normal and proper operation of the facilities. Am. Compl., Ex. 3 at 10. As the Amended Complaint acknowledges, these structures and discharges therefrom are facilitating the operations of the Facilities and any discharges from them are authorized. Moreover, to the extent the Amended Complaint is referring to periodic delousing vessel operations, those vessels are permitted under the Vessel Incidental Discharge Act of 2018 codified in 33 U.S.C. § 1322, and CLF has also not alleged a violation of 33 U.S.C. § 1322 or any Vessel General Permit.

## B.  CLF's Sampling Protocols and Results Are In Accordance with its Permits

The Amended Complaint asserts "on information and belief"[48] that any sulfide sampling detection of 500 μM or above violates the Permits. The Amended Complaint does not reveal the

---

[46] Am. Compl. ¶¶ 160–162.
[47] Am. Compl. ¶¶ 165–170.
[48] *See* Am. Compl.  ¶¶ 214–216, 232, 236–237, 240, and 242–243.

basis on which this allegation rests, which is not surprising because it is simply wrong. The General Permit specifies as acceptable (1) an annual site-average measurement of 3,000 sulfide micromoles (µM) or less outside the mixing zone, and (2) a restocking site-average threshold of 4,000 sulfide µM. Based on years of experience, the MEDEP has determined the acceptable sulfide concentrations as specified in the Permits. *See* Woodock Aff., Ex. A at 11 (establishment of a restocking threshold within the mixing zone), 13 (describing tiered benthic monitoring approach), 14 (applying a site-wide average of specific locations to sulfide sampling results to determine compliance). CLF ignores the specified General Permit requirements in an attempt to rely on selected excerpts from Cooke's reports to assert that a detection level not contained in the General Permit establishes "toxicity." *See generally* Am. Compl. ¶¶ 190–232.

The General Permit must be read as a cohesive document, and it is non-sensical to interpret it such that "toxicity" is found when a specified detection level is met. *See Congaree Riverkeeper, Inc. v. Carolina Water Serv., Inc*., 248 F. Supp. 3d 733, 752–53 (D.S.C. 2017) ("[a] NDPES permit must be interpreted to give full meaning and effect to all of its provisions and avoid focusing on a few isolated provisions.") (citing *Nat'l Res. Def. Council v. Cty. of Los Angeles*, 725 F.3d 1194, 1206 (9th Cir. 2013). Moreover, even if exceedances are detected above the two specified General Permit levels, they "do not constitute a violation of this General Permit." Am. Compl., Ex. 3 at 12. Rather, exceedances simply trigger follow-up actions.

The Amended Complaint's allegations that inappropriate sampling locations based upon its "Google Earth," analysis found in Am. Compl. Ex. 6 also completely misstates the specific sampling locations established by GPS coordinates required in the Permits and Cooke's compliance therewith. *See* Am. Compl. ¶¶ 234–237, 345. CLF's selective inclusion of only the first page and the appendices (photos) for the reports included in Am. Compl., Ex. 5 excludes the

accompanying text which confirms the samples were taken in accordance with the locations identified in the NOI and the Permit Modification. *See also* Woodcock Aff., Exs. S–EE at 2 in each report. CLF presents no evidence to the contrary.

Similarly, the Amended Complaint's allegations that the samples collected were of an improper size as delineated must also fail. *See* Am. Compl., ¶¶ 237-238; Ex. 7. The Amended Complaint relies upon a passing reference to "[p]ipet 200 mL sample into flask,"[49] which stems from a standard sampling protocol for sulfide regardless of the media being sampled and how the sample is collected.[50] The Permits, however, specifically direct Cooke to work with the selected analytical laboratory on the necessary sample volume required to conduct the analysis. *See* Am. Compl., Ex. 4, Attach. A at 5. With no allegation, let alone one that is plausible, that Cooke has not worked appropriately with the selected analytical laboratory to determine the appropriate sample volume to allow for the required analysis, the Amended Complaint's allegations concerning sample size fail.

## IV.    Counts III and VI Fail Because the Amended Complaint Fails to Plausibly Allege Required Ongoing Violations of the CWA.

Citizen suits under the CWA may be brought only for an *ongoing* violation at the time of suit. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 59 (1987) (finding that the CWA's "alleged to be in violation of" language limited citizen suits to present or future violations); *U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC*, 339 F.3d 23, 33 (1st Cir. 2003). CWA citizen claims, then, must be dismissed where they fail to "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57; *see also Conservation L. Found., Inc. v. New*

---

[49] Am. Compl. ¶ 102.
[50] *See* Am. Compl., Ex. 4, Attach. A.

*Hampshire Fish & Game Dep't*, No. 18-CV-996-PB, 2020 WL 5102830, at *7 (D.N.H. Aug. 27, 2020) (dismissing CLF claims about fish hatchery, in part, because of CLF's failure to allege ongoing violations). In other words, Complaints that fail to make "good-faith allegations of continuous or intermittent violation[s]" of the CWA warrant dismissal. *Id.* at *7 (citing *Gwaltney*, 484 U.S. at 64).

The Amended Complaint therefore must offer plausible factual allegations of ongoing CWA violations at all 13 of Cooke's Facilities and it fails to do so. *See Twombly*, 550 U.S. at 557. "A ceased improper discharge does not 'continue,'" and is therefore not a good faith allegation of a continuous or intermittent CWA violation. *See Pawtuxet Cove Marina, Inc. v. Ciba-Geigy* Corp., 807 F.2d 1089, 1092 (1st Cir. 1986) (affirming district court dismissal of CWA citizen suit where defendant had ceased operating its facility at the time of the complaint because no ongoing violation could be occurring).

Good faith allegations of continuous violations do not occur long before a complaint is filed. *See Pilgrim Public Interest Lobby v. Dow Chemical Co*., 1996 WL 903838 (E.D. Mich. Feb. 16, 1996) ("Being approximately 20 months prior to the filing of their complaint, and without any other factual allegations, plaintiffs' "ongoing and continuous" allegation is rendered a mere conclusory statement upon which the Court's jurisdiction cannot rest."). Conclusory allegations similarly do not suffice to establish ongoing violations. *See Tennessee Riverkeeper v. Waste Connections of Tennessee, Inc.*, 769 F. Supp. 3d 784, 793 (M.D. Tenn. 2025) (holding that alleging violations are ongoing, or likely to recur, is insufficient to establish subject matter jurisdiction).

The reporting violations of untimely and inaccurate reports in as alleged in Count VI fail to plausibly allege ongoing violations. With regard to timeliness, CLF alleges Cooke submitted various monthly Feed & Fish Reports and Drug Treatment Reports late for ten of its thirteen

Facilities.[51] However, only four Feed & Fish Reports were allegedly filed late with the last one being on February 8, 2023. Similarly, there have been no late submission of the monthly Drug Treatment Reports since 2022 with a majority of the late reports occurring during the pandemic and/or being related to correction of small administrative or typographical errors. Lastly, even though CLF alleges Standing Inventory Reports were similarly late, there are no specific allegations of any such late submittals. *See* Am. Compl. ¶¶ 89, 304, and 306. Given the last allegation of any late report is February 8, 2023, approximately two years before this case was brought, CLF cannot plausibly allege an ongoing violation of timely submission of reports required for jurisdiction.

Similarly, the Amended Complaint also fails to provide any specific references, let alone ongoing, evidence of inaccurate reporting. As discussed above, CLF's allegations pertaining to inaccurate reports have no plausible or other support, yet the Amended Complaint asserts without support that Cooke engages continuously in inaccurate reporting. Making up allegations does not suffice to establish an ongoing violation. Accordingly, Count VI should be dismissed.

In addition to Count VI, Count III also fails to the extent it relies on alleged isolated incidences at certain of Cooke's Facilities. Specifically, CLF claims "upon information and belief" that Cooke "discharged escaped fish" during several events. Am. Compl. ¶¶ 160-162 (holes reported in 2020 at Cutler West and Calf Island); ¶¶ 169–171 (identifying three alleged isolated incidences of Cooke supposedly lowering nets to release seals in 2020 at Cross Island and Starboard Island); and ¶ 166 (2023 report of escaped fish).[52] However, no fish actually escaped

---

[51] *See* Am. Compl. ¶¶ 273–274 & 300 (Black Island North), 275–276 & 301 (Black Island South), 277–280 & 303 (Harbor Scrag), 281–283 (Calf Island), 284–286 (Sand Cove), 287–289 (Spectacle Island), 290 (Starboard Island), 291–294 (South Bay), 295 & 302 (Deep Cove), and 296–298 (Broad Cove).

[52] Predator nets surround the nets that maintain the growing fish and fish are not maintained within that space. *See* Woodcock Aff., Exs. GG–SS at Section 4.3 in each report.

during these events. *See* Argument, Section III(A) at 28-29; Woodcock Aff., Exs. TT – WW at 3 in each report, and Ex. XX. Even if CLF's allegations were accurate, the Amended Complaint cannot rely upon occasional events, the last one of which occurred 2 years prior to the filing of the complaint to support an ongoing violation.

Similarly, Count III fails to the extent CLF's allegations of isolated disease incidents or other mortality events at some of Cooke's permitted Facilities do not establish ongoing violations.[53] Even if these occurrences were violations as an unpermitted discharge, there is no information on which to plausibly assert that the events are ongoing. CLF's attempt to imply some sort of routine malfeasance on the part of Cooke in caring for their animals completely lacks foundation. The Permits authorize the use of medication reflecting an understanding that disease is a normal part of raising salmon.

Additionally, Count III fails to the extent it purports to rely on occasional conditions in the water such as low dissolved oxygen and algae blooms. Cooke is not the cause of these conditions and even if it was, there is no pattern or practice alleged sufficient to establish an ongoing violation.

## <u>CONCLUSION</u>

For the aforementioned reasons, Cooke's Motion to Dismiss should be allowed.

---

[53] *See* Am. Compl. ¶¶ 124–126, 131–133, 244.

Cooke Aquaculture USA Inc.

By its Attorneys,

*/s/ Timothy C. Woodcock*

Timothy C. Woodcock
P. Andrew Hamilton
Jonathan A. Pottle
Janna Gau

KATAHDIN LAW, LLC
175 Exchange Street, Suite 260 (04401)
Bangor, ME 04402
Tel: (207) 385-2010

twoodcock@katahdin-law.com
ahamilton@katahdin-law.com
jpottle@katahdin-law.com
jgau@katahdin-law.com


Deborah E. Barnard, *Pro Hac Vice*
Dianne R. Phillips, *Pro Hac Vice*
HOLLAND & KNIGHT, LLP
10 St. James Place, 11th Floor
Boston, MA 02116
Tel: (617) 523-2700

deborah.barnard@hklaw.com
dianne.phillips@hhklaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September, 2025, I caused the foregoing and accompanying documents to be served upon all counsel of record via the Court's CM/ECF system.

*/s/ Timothy C. Woodcock*

35