**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **CONSERVATION LAW FOUNDATION INC.,** | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **No. 1:25-cv-00013-KFW** |
| **COOKE AQUACULTURE USA INC.,** | ) | |
| **Defendant** | ) | |

## ORDER ON MOTION TO DISMISS[1]

Plaintiff Conservation Law Foundation Inc. (CLF), a member-supported nonprofit, brings this citizen suit against Defendant Cooke Aquaculture USA Inc. (Cooke) under section 505 of the Clean Water Act (CWA). 33 U.S.C. § 1365. CLF alleges that Cooke is discharging pollutants into waters of the United States in violation of limitations imposed through a National Pollution Elimination Discharge System (NPDES) permit issued by the Maine Department of Environmental Protection (MEDEP). Cooke now moves to dismiss the amended complaint, arguing that (1) CLF lacks standing to bring the claims, (2) certain claims rely on limitations that are no longer enforceable, (3) it is shielded from liability on certain claims under 33 U.S.C. § 1342(k), and (4) the amended complaint fails to allege that certain violations are ongoing. For the following reasons, the motion is granted in part and denied in part.

[1] The parties have agreed to have me preside over all proceedings in this action, including the entry of judgment. ECF No. 37.

## I. Legal Standard

Cooke moves to dismiss CLF's amended complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(1) "raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it." *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 8 n.6 (1st Cir. 2005) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350, at 61 (3d ed. 2004)). A "trial court without jurisdiction lacks 'all authority to hear a case.'" *United States v. Millenium Labs., Inc.*, 923 F.3d 240, 249 (1st Cir. 2019) (quoting *United States v. Kwai Fun Wong*, 575 U.S. 402, 409 (2015)). As a general rule, "courts must adjudicate plausible challenges to their jurisdiction prior to adjudicating the merits of a case." *Brait Builders Corp. v. Massachusetts*, 644 F.3d 5, 10 (1st Cir. 2011). The plaintiff, as the party invoking the court's jurisdiction, bears the burden of proving that such jurisdiction exists. *Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996). In determining whether that burden has been met, the court must construe the complaint liberally, "treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." *Id.* at 1210.

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Id.* at 53 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)). Courts apply a "two-pronged approach" to assess the plausibility of the allegations. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). First, the court

must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and, second, the court will take the complaint's well-pleaded "facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

## II. Factual Background

CLF's amended complaint alleges the following facts. Cooke owns thirteen net pen aquaculture facilities designed for industrial salmon farming off the coast of Maine.[2] Amended Complaint (ECF No. 17) ¶¶ 2, 45-46, 59-60. Each facility operates under a NPDES permit issued by the MEDEP pursuant to authority delegated by the United States Environmental Protection Agency (EPA), *id.* ¶¶ 30, 75, and contains anywhere from six to thirty net pen systems, *id.* ¶ 48. Fish in the net pens sometimes suffer disease outbreaks and die. *Id.* ¶ 55. Carcasses and contagions pass through the net pens because the systems are designed to use the same water as the surrounding environment. *Id.* ¶¶ 45, 50, 55, 113, 143, 159, 173. Cooke treats the fish in the net pens by administering drugs and chemicals, which flow through them into the surrounding waters. *Id.* ¶¶ 159, 164.

Cooke's salmon farming process grows smolts to their harvest weight of ten to fifteen pounds. *Id.* ¶ 54. During this process, the sites experience an average mortality rate of roughly 15%. *Id.* ¶ 58. To facilitate this process and the overall

[2] These facilities are located around: Black Island; Black Island South; Harbor Scrag; Calf Island; Sand Cove; Spectacle Island; Starboard Island; Cross Island; Cross Island North; Cutler Wester; South Bay; Deep Cove; and Broad Cove. *Id.* ¶ 21.

operation, Cooke is authorized to discharge pollutants under the following circumstances: 1) in accordance with the Notice of Intent, which is a required step of the permitting process; 2) in accordance with the terms of the General Permit; and 3) those incidental to the operation of the facility so long as they do not cause or contribute to a violation of applicable water quality standards or the General Permit. *Id.* ¶ 82. Although Cooke is allowed to discharge from the net pen systems, the General Permit requires the company to

> employ efficient feeding strategies that limit feed input to the minimum amount reasonably necessary to achieve production goals and sustain targeted rates of aquatic animal growth. These strategies must minimize the accumulation of uneaten food beneath the pen through the use of real-time feed monitoring, including devices such as video cameras, digital scanning sonar, and upweller systems; monitoring of sediment quality beneath the pens; monitoring of benthic community quality beneath the pens; capture of waste feed and feces; or other good husbandry practices approved by the Department.

*Id.* ¶ 83.

To ensure compliance, Cooke must maintain records and send monthly reports to the MEDEP to inform the agency how many net pens it is using, the number of months for which each pen has been stocked, the average weight and number of fish in each pen, and the total feed added. *Id.* ¶ 88. The reporting requirement includes any drugs or disease-control chemicals Cooke administers in each pen. *Id.* ¶ 90. The drug treatment report must include a series of categories regarding where, how, and how much treatment was administered. *Id.* ¶ 91.

The General Permit also requires sulfide monitoring at various depths and positions related to the net pen locations. *Id.* ¶¶ 92-102. The monitoring methods

must be conducted in accordance with EPA-approved methods or by another method approved in writing by the MEDEP. *Id.* ¶ 98.

Finally, the General Permit imposes so-called "narrative" and "numeric" limitations. *Id.*¶¶ 104-12. The narrative limitations proscribe the

- discharge of pollutants that cause a visible oil sheen, foam, or floating solids at any time that would impair the use designated by the classification of the receiving waters
- discharge of pollutants that contain materials in concentrations or combinations that are hazardous or toxic to aquatic life, or that would impair the existing or designated uses of the receiving waters
- causing or contributing to conditions that are hazardous or toxic to aquatic life, or that would impair the uses designated by the classification of the receiving waters.

*Id.* ¶¶ 107-09. The relevant numeric limitations require that Cooke cannot stock its net pen sites until it "demonstrates to the Department's satisfaction that the sulfide levels within the mixing zone are equal to or less than" certain predetermined measurements at specific sample sites. *Id.* ¶ 111.

CLF alleges that Cooke violates the General Permit by discharging pollutants that violate the internal and external limitations for the approved mixing zones, *id.* ¶¶ 184-232, that Cooke discharges pollutants resulting in toxic sea floor conditions, *id.* ¶¶ 233-41, that these discharges contribute to nutrient pollution and low dissolved oxygen levels, *id.* ¶¶ 242-45, and that Cooke practices threaten native Atlantic salmon by causing environmental changes and releasing escaped fish from the net pen system, *id.* ¶¶ 246-265. CLF also alleges that Cooke fails to comply with the General Permit's reporting requirements, which inhibits proper oversight by the MEDEP. *Id.* ¶¶ 266-304. And that the combination of the alleged violations harms

CLF's members who recreate, enjoy, and rely on Maine's coastal waters for their livelihoods.[3] *Id.* ¶¶ 305-20.

## III. Discussion

CLF brings six claims for violations of the CWA. Count I alleges that Cooke is violating the effluent limitations through its unlawful discharges. *Id.* ¶¶ 328-38. Count II alleges that Cooke's discharges violate the sediment and benthic limitations and associated monitoring requirements. *Id.* ¶¶ 339-45. Count III alleges that Cooke discharges unauthorized pollutants. *Id.* ¶¶ 346-49. Count IV alleges that Cooke discharges from unauthorized point sources. *Id.* ¶¶ 350-54. Count V alleges that Cooke fails to meet the General Permit's best practicable treatment standards. *Id.* ¶¶ 355-62. And Count VI alleges that Cooke violates monitoring and reporting requirements. *Id.* ¶¶ 363-66.

Cooke filed the instant motion to dismiss, arguing that all counts should be dismissed because CLF has failed to plead sufficient facts that would demonstrate Article III standing. Motion (ECF No. 27-1) at 12-18. Cooke alternatively argues that Count I should be dismissed because it relies on unenforceable end-result standards, *id.* at 18-22; that Counts I-V should be dismissed because the company is complying with the General Permit, which blocks the claims under the CWA's permit shield provision, *id.* at 22-31; and that Counts III and VI fail because CLF does not allege ongoing violations, *id.* at 22-31. I address the standing arguments first because

---

[3] In responding to Cooke's motion to dismiss, CLF attached six declarations from members who utilize the Maine coast for recreational and commercial purposes. ECF Nos. 31-1 to 31-6. The declarations allege impact to personal and professional activities including boating, swimming, fishing, lobstering, research, and personal time spent cleaning up alleged discharges from Cooke net pen sites. *Id.*

they are jurisdictional in nature. *See Acosta Ramirez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013) ("Federal courts are obliged to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case.").

**A. Standing**

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). A member has standing if they "(1) suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 180-181 (cleaned up). Common examples of injury in fact include damage to one's physical, monetary, property, or constitutional rights, or injury to aesthetic and recreational value. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *Sierra Club v. Morton,* 405 U.S. 727, 734 (1972). In environmental litigation, "the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003).

The burden on the party seeking to maintain standing depends on the manner and degree of evidence required at the stage of litigation where the issue arises. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Cooke has decided to test CLF's

standing with an immediate motion to dismiss. Thus, I refer only to the well-pleaded factual allegations in the amended complaint and supporting declarations appended to CLF's response to the motion to dismiss. *See Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 7 (1st Cir. 2014) ("[W]here . . . standing is at issue we may consider further particularized allegations of fact deemed supportive of plaintiffs' standing, such as those contained within an affidavit." (cleaned up)).

Cooke focuses its argument on the injury element of standing, namely that the amended complaint fails to "identify a single member who has been harmed or is at imminent risk of harm due to Cooke's maintenance and operations . . . at any of Cooke's 13 Facilities." Motion at 15; Reply (ECF No. 34) at 4. CLF's declarations from specific members provide further detail regarding the alleged harm caused by Cooke facilities. *See supra* n.3.

Through the amended complaint and declarations, CLF alleges that its members suffer from reduced opportunities for (and enjoyment from) observing wildlife, Amended Complaint ¶¶ 308, 311-12; from collecting trash discharged from Cooke's net pen sites, *id.* ¶¶ 313-15; and from foul sights and odors from Cooke's farming locations, *id.* ¶¶ 316-18. CLF has members who lobster near the net pen sites who have relocated their traps. *Id.* at ¶¶ 309-10. Members' personal and professional lives have been affected by discharges that harm wild Atlantic salmon populations, impeding CLF members' efforts to restore Atlantic salmon runs to Maine's rivers. *E.g.*, ECF No. 32-1 at 3. Drawing all reasonable inferences in favor of CLF and its members, these harms are traceable to Cooke's alleged violations and are redressable

by this Court. *See Gustavsen v. Alcon Laboratories, Inc.*, 903 F.3d 1, 7 (1st Cir. 2018) (reviewing courts must "indulge all reasonable inferences . . . in [the plaintiff's] favor" when evaluating standing at the motion to dismiss stage). Thus, at this early stage, CLF has demonstrated a personal stake on behalf of its members to answer the paradigmatic standing question: "What's it to you?" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)); *see, e.g.*, Response at 17.

**B. End-Result Provisions**

Cooke argues that Count I of CLF's amended complaint fails to state a claim for two reasons. First, it alleges violations of two permit sections, H and J, that are unenforceable following the Supreme Court's decision in *City & County of San Francisco v. EPA*, 604 U.S. 334, 355 (2025) [hereinafter *SF v. EPA*] because the permit conditions compliance on the quality of the receiving water while simultaneously not explaining what Cooke must do to comply.[4] Motion at 18-22. Second, Cooke argues that CLF has failed to plead sufficient facts to plausibly allege violations. *Id.* at 22. I agree with Cooke that the permit section H is unenforceable following *SF v. EPA*, but a portion of J.2 is a permissible narrative limitation.

---

[4] The waters at issue here are SB classified waters, Amended Complaint ¶¶ 173-83, meaning they "must be of such quality that they are suitable for the designated uses of recreation in and on the water, fishing, aquaculture, propagation and harvesting of shellfish, industrial process and cooling water supply, hydroelectric power generation, navigation and as habitat for fish and other estuarine and marine life." 38 M.R.S.A. § 465-B(2).

Section H says:

This General Permit designates two mixing zones: (1) a Water Column Mixing Zone, and (2) a Sediment Mixing Zone. Outside the designated Mixing Zones, discharges from the facility must not cause or contribute to conditions that are hazardous or toxic to aquatic life, or that would impair the uses designated by the classification of the receiving waters. Within the designated mixing zone, the discharge must not cause or contribute to conditions that are lethal to passing organisms indigenous to the receiving water. The permittee may request, and the Department may, at its discretion, approve, a shift in the location of the mixing zone to reflect the effect of ocean current unique to a specific site, provided that the shift does not result in an expansion in size from the designated mixing zone.

1. **Water Column Mixing Zone.** The Water Column Mixing Zone is defined as the area within and extending 30 meters beyond the perimeter of a net pen in all directions on the surface, and down to the sea floor/water column interface.

   **The dissolved oxygen concentration within the water column mixing zone must not be lower than 6 mg/L at any point from the surface down to the sea floor/water column interface.** The Department reserves the right to require routine or periodic dissolved oxygen monitoring within the water column mixing zone for any facility covered under this General Permit. In the event that a facility determines ambient DO within the water column mixing zone is less than 6 mg/L, the Department will take into consideration DO monitoring results from upcurrent and down-current monitoring stations in determining a facility's contribution to low ambient DO. Except for dissolved oxygen percent saturation, water quality within the water column mixing zone must comply with the applicable standards specified at *Standards for classification of marine and estuarine waters*, 38 M.R.S.A. § 465-B. A facility covered under this General Permit may at no time cause non-compliance of numeric or narrative water quality standards outside the designated water column mixing zone.

2. **Sediment Mixing Zone.** The Sediment Mixing Zone is defined as the sea floor directly below a net pen and extending on the sea floor 30 meters beyond the perimeter of each net pen in all directions. Compliance monitoring associated with this General Permit will be conducted at sampling locations that are 35 meters beyond the edge of the outermost net pens.

General Permit at 14.

The language governing external water quality does "not spell out what a permittee must do or refrain from doing; rather, [it] make[s] a permittee responsible for the quality" of the receiving waters. *SF v. EPA*, 604 U.S. at 338. It says that "the facility must not cause or contribute to conditions that are hazardous or toxic to aquatic life, or that would impair the uses designated by the classification of the receiving waters." General Permit at 14. This is a pure end-result limitation that gives no guidance on how to comply with the narrative limitation. *See SF v. EPA*, 604 U.S. at 355.

The provision governing discharges inside the mixing zones says that "the discharge must not cause or contribute to conditions that are lethal to passing organisms indigenous to the receiving water." *Id.* Instead of regulating Cooke's discharges, this limitation looks to an outcome, i.e., whether passing organisms have died. In *SF v. EPA*, the Supreme Court concluded that the CWA tells the agency issuing the permit that it must set "concrete" measures "to give practical effect to" and ensure "actual fulfillment" of the permit limitation. 604 U.S. at 347. "Simply telling a permittee to ensure that the end result is reached is not a 'concrete plan' for achieving the desired result." *Id.* Here, the permit tells Cooke that passing organisms cannot die. General Permit at 14. This is not a concrete plan for achieving that result. Accordingly, section H is unenforceable.

I next turn to section J, which in relevant part, says the following:

> Outside the designated mixing zone, discharges from the facility must not cause or contribute to a violation of water quality standards, including the following narrative standards.
>
> > 1. The permittee must not discharge pollutants that cause a visible oil sheen, foam, or floating solids at any time that would impair the uses designated by the classification of the receiving waters.
> >
> > 2. The permittee must not discharge pollutants that contain materials in concentrations or combinations that are hazardous or toxic to aquatic life, or that would impair the existing or designated uses of the receiving waters.

General Permit at 16. This section suffers from similar problems as section H. The one difference is that J.1 discusses specific discharges, and J.2 says that the concentration of discharges cannot be hazardous to aquatic life. *See id.* The General Permit, however, otherwise authorizes discharges of pollutants that are incidental to the proper operation of the net pens. *Id.* at 10. Thus, section J.1 is not a limitation on certain discharges, as they are otherwise allowed by the permit; it is a limitation impairing the quality of the receiving water. *See id.* And its only directive is that Cooke cannot discharge pollutants that would "impair the uses designated by the classification of the receiving waters." *Id.* at 16. "Such a directive simply states the desired result; it does not implement that result." *SF v. EPA*, 604 U.S. at 347. Like section H, this language does not create the "concrete plan" required by the CWA. Therefore, section J.1 is unenforceable.[5]

[5] Based on *San Francisco Baykeeper v. City of Sunnyvale*, No. 5:20-cv-00824-EJD, 2025 WL 1382862, at *2 (N.D. Cal. May 12, 2025), CLF's opposition discounts Cooke's argument as an impermissible collateral attack. Response at 17-21. However, in bringing this citizen suit, CLF can only allege violations of "an effluent standard or limitation *under this chapter*. . . ." 33 U.S.C. § 1365(a)(1) (emphasis added). In *SF v. EPA*, the Supreme Court concluded that permit limitations conditioning compliance on the quality of the receiving water are unenforceable under the CWA. 604 U.S. at 338,

Similarly, the portion of J.2 restricting discharges "that would impair the existing or designated uses of the receiving waters" is an unenforceable end-result limitation. The language restricting the discharge of "pollutants that contain materials in concentrations or combinations that are hazardous or toxic to aquatic life," however, is focused on the discharge as opposed to the receiving waters. The phrase "hazardous or toxic" focuses on the biological condition of the discharge. This is not an end-result limitation, and this portion of section J.2 is enforceable. CLF alleges that Cooke violates this provision by "discharging disease, sea lice, escaped fish, warm water, blood, and undisclosed chemicals." *See, e.g.*, Amended Complaint ¶¶ 150-55, 331. Therefore, Count I remains only to the extent that it alleges Cooke discharges "pollutants that contain materials in concentrations or combinations that are hazardous or toxic to aquatic life."

**C. Permit Shield Doctrine**

Next, Cooke contends that the permit shield provision, *see* 33 U.S.C. § 1342(k), bars Counts I-V because the company complies with the General Permit. Motion at 22-29. At this early stage in the litigation, the permit shield provision cannot operate as Cooke suggests. Cooke asks me to review what is essentially a summary judgment record without the benefit of briefing, statements of material facts, or proper contravention of opposing statements of material facts. Cooke argues that I may

355. Therefore, because permit sections H, J.1, and part of J.2 fall within the *SF v. EPA* decision, CLF cannot enforce them "under this chapter." 33 U.S.C. § 1365(a)(1); *SF v. EPA*, 604 U.S. at 338, 355. Finally, taking CLF's collateral attack argument to its logical conclusion would allow it to pursue monetary penalties for permit sections that the CWA does not allow, an absurd result that must be avoided if a reasonable alternative interpretation exists. *See Arevalo v. Ashcroft*, 344 F.3d 1, 8 (1st Cir. 2003) ("It is trite, but true, that courts are bound to interpret statutes whenever possible in ways that avoid absurd results.").

review over 1,200 pages of documents attached to its motion to dismiss to determine that it is in factual compliance with its General Permit. *See* Motion Exhibits ECF Nos. 26-1 to 26-15, 27-2 to 27-6. Despite the general rule at the motion to dismiss stage limiting a court's review to the well-pleaded facts in the complaint, Cooke points to an exception allowing certain documents to be considered without converting the motion to one for summary judgment. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Such documents include those with no dispute as to authenticity, official records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint. *Id.* However, the First Circuit has emphasized how narrow this exception is, and courts strictly enforce the categories of extrinsic documents they may consider at this stage. *See Freeman v. Town of Hudson*, 714 F.3d 29, 36-37 (1st Cir. 2013).

Interpreting this narrow exception to allow 1,200 pages of exhibits would undermine the judicial decision-making process, and I decline the invitation to consider them for the purposes of the motion to dismiss. *See Equal Emp. Opportunity Comm'n v. Telecare Mental Health Servs. of Washington, Inc.*, No. 2:21-CV-01339-BJR, 2023 WL 5348880, at *4 (W.D. Wash. Aug. 21, 2023) ("Courts have no obligation to sift through potentially hundreds of pages of exhibits (in this case the parties filed over 1,000 pages of exhibits in support of their motions), searching for evidence supporting a party's position." (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).[6]

---

[6] Additionally, the cases that Cooke cites to support its application of the permit shield provision further demonstrate why it is inappropriate for me to consider the proposed exhibits at this early

The only question then, is whether CLF has plausibly alleged violations of the CWA in Counts I-V. It has. CLF's Amended Complaint and its supplement allege a range of discharges including excess feed, feces, dead fish, chemicals, solid waste, and fuel that are being released from Cooke's net pen facilities.[7] Amended Complaint at ¶¶ 113-72; Supplemental Complaint (ECF No. 39-1) ¶¶ 1-10. CLF alleges that these discharges harm the receiving waters in violation of specific sections of the General Permit which harms CLF members who rely on the receiving waters for professional and recreational pursuits. Amended Complaint ¶¶ 184-320, 321-66.

**D. Ongoing Violations**

Cooke argues that Counts III and VI fail to state claims because CLF has not alleged that the violations are ongoing. Motion at 31-34. Count III alleges that Cooke discharges pollutants not authorized by the General Permit. Complaint ¶¶ 346-49. Count VI alleges violations of the monitoring and reporting requirements. *Id.* ¶¶ 363-66. I conclude that Cooke has plausible allegations.

Citizen suits under the CWA are only viable if they allege "ongoing" or "intermittent" violations. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, Inc., 484 U.S. 49, 59, 64 (1987). Such violations must demonstrate "a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57.

stage. Notably absent from Cooke's citations is any authority applying the permit shield provision on a motion to dismiss. This is likely because the shield provision is designed "'to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict.'" *Sierra Club*, 781 F.3d at 285 (quoting *E. I. du Pont de Nemours & Co.*, 430 U.S. at 138 n.28)). CLF, however, is not challenging whether the permit is strict enough; it is challenging whether Cooke is complying with its terms.

[7] I granted the motion for leave to supplement the complaint. *See* ECF No. 44.

Count III alleges that "[e]ach day since November 14, 2019 on which Cooke has discharged unauthorized pollutants, including during each sea lice and disease outbreak at the Cage Sites and during each escape event, Cooke has violated and is violating" the General Permit and the CWA. Complaint ¶ 349. Count VI alleges that Cooke has violated multiple permit provisions by failing to submit timely and accurate reports which are due on a repeated interval. *Id.* ¶¶ 363-66. In doing so, CLF incorporates previous portions of the Amended Complaint that plausibly allege continuous and intermittent violations that are general to Cooke's practices employed at each net pen site. Complaint ¶¶ 89, 121-37, 143-45, 162-72, 304-06, 346-54, 363-66. Cooke's arguments to the contrary are unpersuasive and fail to engage with the "intermittent" portion of the ongoing violations analysis. *See* Motion at 31-34.

## IV. Conclusion

For the foregoing reasons I **GRANT** the motion in part as to Count I and **DENY** the motion as to Counts II-VI.[8]

Dated: September 30, 2026

/s/ Karen Frink Wolf
United States Magistrate Judge

[8] Based on the analysis in section B, *supra*, permit sections H, J.1 and a portion of J.2 are unenforceable. Thus Count I remains on limited language in J.2.